**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| CALEB FRANKLIN, on behalf of himself and all others similarly situa<br><br>Plaintiff,<br><br>-against-<br><br>SUNFLOWER LTD.,<br><br>Defendant. | Case No.: 1:25-cv-160-GNS<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Caleb Franklin ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Sunflower Ltd. ("Sunflower" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

**INTRODUCTION**

1. Defendant owns and operates the popular online casino website, https://crowncoinscasino.com. Sunflower launched the Crown Coins website in 2023. Defendant touts their website as the "#1 social casino in America."[1]

2. Defendant offers hundreds of gambling options www.crowncoinscasino.com, including classic slots and numerous other games of chance.

3. However, by operating their online casino, Defendant has violated Kentucky law, which governs Plaintiff's and the Class's claims, and Defendant has illegally profited from tens of thousands of consumers. Accordingly, Plaintiff, on behalf of himself and a Class of similarly

[1] https://crowncoinscasino.com/.

situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys' fees.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the Class is a citizen of a State different from the Defendant.

5. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within this District and a substantial portion of the events that gave rise to Plaintiff's claims occurred in this District.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant transacts business and/or has agents within this District.

## PARTIES

7. Plaintiff Caleb Franklin is a natural person and a citizen of the Commonwealth of Kentucky, residing in Burkesville, Kentucky. Plaintiff Franklin began gambling on the Crown Coins website this year. During this time, Plaintiff Franklin has gambled and lost thousands of dollars on www.crowncoinscasino.com.

8. Defendant Sunflower Ltd. is a Virginia private company with its principal place of business at 1201 Wilson Blvd, Suite 27-104 DD20 Arlington, VA 22209. Sunflower owns and operates the www.crowncoinscasino.com website.

## FACTUAL ALLEGATIONS

### A. Free-to-Play And The New Era Of Online Gambling

9. The proliferation of internet-connected mobile devices has led to the growth of so-called "free-to-play" videogames. With free-to-play games, developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items that start at just a dollar or two (purchases known as "micro-transactions") instead of charging an up-front fee.

10. The free-to-play model has become particularly attractive to developers of games of chance (e.g., slot machine mobile video games), because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue.

11. With free-to-play games of chance, developers have begun exploiting the same psychological triggers as brick-and-mortar casinos. Academics have studied the socioeconomic effect free-to-play games have on consumers. In one study, the authors compiled several sources analyzing free-to-play games of chance (called "casino" games below) and stated that:

> [Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (e.g., employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling.
>
> . . .
>
> According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of[free-to-play] casino gamers make micro- transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-

to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits.[2]

12. The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro- transaction engagement." In fact, "the odds of migration to online gambling were approximately eight times greater among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."

13. The proliferation of online gambling websites also includes a relatively new phenomenon: gambling addiction among minors under the age of 18.[3] Whereas brick-and-mortar casinos could take steps to exclude minors, the easy access to online gambling has made it easier for underage minors to participate in gambling. Websites like www.crowncoinscasino.com are contributing to a sharp rise in online gambling addiction among minors.

14. To make matters worse, although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like www.crowncoinscasino.com are unlicensed and unregulated. A gambling license is a privilege that requires, among other things: (1) meeting state standards; (2) background checks on company officers and directors; (3) adherence to responsible gaming programs; (4) anti-money

---

[2] Hyoun S. Kim, Michael J. A. Wohl, et al., *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014).
[3] Veselka et al., *Factors Associated With Social Casino Gaming Among Adolescents Across Game Types*, 18 BMC Public Health 1167 (2018).

laundering measures; and (5) myriad other requirements concerning data privacy, security, and responding to customer complaints. Defendant dodges all these requirements.

### B. Defendant Uses Free "Social Gaming" As A Front For Real, Online Gambling

15. Defendant owns and operates www.crowncoinscasino.com, where visitors like Plaintiff can gamble real money online through its offering of numerous electric versions of slot machine games and other games of chance on its website. *See* Figures 1 and 2, below and next page.




**Figure 1**




**Figure 2**

16. The games of chance offered on www.crowncoinscasino.com are gambling, and they are no different than if they were played in a Las Vegas casino. Much like in a real casino, players purchase online coins (akin to gambling chips), and then redeem their winnings for cash.

17. However, as a cover for its gambling operations, Defendant claims Crown Coins is just a "social casino" with the "top free-to-play casino style games." That claim is false: no rational business gives away real cash for gambling winnings to customers who never placed bets using real money. Such a company would go out of business quickly. As explained below, the free "social casino" component of Defendant's website is just a pretext or front for the gambling component.

18. The process for getting set up on www.crowncoinscasino.com is incredibly simple. First, a user simply inputs their information on the "Create Account" page. *See* Figure 3, next page.




**Figure 3**

19. Once a user creates their account, they go through a quick account verification process through their email.

20. After a user verifies their account, they are given a tutorial on how Crown Coins operates. The website explains that the casino uses two different types of coins, which correspond to the social gaming and the gambling distinction on its website: "Crown Coins" and "Sweeps Coins." Both coins can be used to play any of the games on the website, but a player can only win "real prizes" like cash for bets played with "Sweeps Coins." *See* Figure 4, next page.




**Figure 4**

21. In "Sweep Coins Mode," one coin is equivalent to one U.S. dollar. So, for example, if someone has 25,000 Sweep Coins in their account, they have the equivalent of $25,000 in their account.

22. When a consumer first sets up an account on Defendant's website, they are given a free bundle of 100,000 "Crown Coins" and 2 "Sweep Coins." After consumers inevitably lose their initial allotment of coins, Defendant attempts to sell them additional coins. Consumers cannot play on the website without coins.

23. Generally, the only way to get additional "Sweep Coins," apart from winning them in gambling, is to purchase them. Defendant claims that it only sells "Crown Coins" for social gaming but gives away "Sweep Coins" (i.e. for real gambling) as a "free" bonus with the purchase of "Crown Coins." The reality, however, is that website visitors are paying for the "Sweep Coins," which have actual dollar value, and are getting the "Crown Coins" (which have no dollar value) as the free bonus.

24. Purchases can be made by Apple Pay, credit card, or Skrill. Regardless of payment method, coins are instantly available for gambling. *See* Figure 5, below.




**Figure 5**

25. The bottom line is that website visitors usually pay money to get "Sweep Coins," just like someone pays money to get poker chips at a real casino. The fact that Defendant chooses to falsely label them as a "bonus" does not change that fact. These coins permit consumers to have the privilege of playing Defendant's games.

26. Consumers are able to cash out their winnings, if any, through Defendant's payment platform once they've won a minimum of 50 "Sweep Coins." If a consumer never reaches 50 "Sweep Coins," they can never receive any cash from Defendant.

27. Defendant maintains win and loss records and account balances for each consumer. Indeed, once Defendant's algorithms determine the outcome of a game and Defendant displays the outcome to the consumer, Defendant adjusts the consumer's account balance. Defendant keeps records of each wager, outcome, win, and loss for every player of the games.

28. Despite the clear purpose of the website, the word "gambling" is rarely used on the website. Instead, Defendant gaslights users—including adolescents and people struggling with gambling disorder—with euphemisms like "social play" and "sweepstakes."

29. And yet in a nod to what is really going on, www.crowncoinscasino.com includes website links to its "Responsible Social Play Page," where it provides information about organizations including the National Foundation for Credit Counseling for those whose "gaming activities have had a negative impact on [their] mental and emotional health, as well as a detrimental financial impact." Ironically, this page admits that the "winners of games are determined at random."

**C. Defendant Has Deployed An Old Gimmick That Criminals Once Tried To Use To Evade Gambling Laws**

30. Defendant will claim that www.crowncoinscasino.com is not really a gambling operation, but instead offers legal "sweepstakes." That is an old gimmick that was once popular among criminals in the early 2000's. As detailed below, courts and law enforcement agencies consistently determined that the same business model Crown Coins utilizes today is a pretext for illegal gambling. A federal district court has already held on summary judgment that one of Crown Coins' competitors that operates materially the same way is an illegal gambling operation, and a jury later awarded close to $25 million in damages to a class of Washington state residents. *See Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024).

31. The sections that follow detail how illegal gambling operations at so-called "Internet cafés," which were popular in the early 2000s, evolved into the ubiquitous "social casinos" seen online today, and how Crown Coins is an online version of an illegal Internet café.

**1. The Internet Café "Sweepstakes" Crime Trend Of The Early 2000's**

32. The early 2000's saw a nationwide crime trend where criminals attempted to

evade gambling laws by offering gambling at "Internet cafés." These operations—often located in suburban strip malls—"promoted" the sale of products such as Internet time or long-distance telephone minutes by offering "free" sweepstakes entries to customers. When customers purchased the product, they received a corresponding number of "sweepstakes" points for each dollar spent. Customers then used those sweepstakes points to play "casino-style" slot machine games for cash prizes at computer terminals provided at the Internet cafés. *See* **Exhibit 1** (law enforcement advisory explaining how Internet cafés worked).

33. Most states' gambling laws require three elements: prize, chance, and consideration. By artificially separating the consideration from the chance to win real money, criminals believed that they could evade state gambling laws, while claiming that the activities were no different from the sweepstakes promotions offered by Publisher's Clearing House and McDonalds.

34. Courts and state law enforcement officials in the United States repeatedly determined that such tactics were an obvious pretext and cover for illegal gambling.

35. It appears that every court in the United States to address the issue has determined that Internet café's are illegal gambling operations. *See Lucky Tunes #3 LLC v. Smith*, 2019 WL 13436322 (E.D. Tex. Nov. 18, 2019); *Texas v. Ysleta Del Sur Pueblo*, 2015 WL 1003879 (W.D. Tex. Mar. 6, 2015); *State v. Fellows*, 471 S.W.3d 555 (Tex. 2015); *U.S. v. Davis*, 690 F.3d 330 (5th Cir. 2012); *Moore v. Mississippi Gaming Comm'n*, 64 So.3d 537 (Miss. 2011); *Barber v. Jefferson*, *County Racing Ass'n., Inc.*, 960 So.2d 599 (Ala. 2006); *Jester v. State*, 64 S.W.3d 553 (Tex. 2001); *Midwestern Enterprises, Inc. v. Stenehjem*, 625 N.W.2d 234 (N. Dakota 2001); *Mississippi Gaming Comm'n. v. Six Electronic Video Gambling Devices*, 792 So.2d 321 (Miss. 2001).

36. For example, in 2011, three individuals were indicted and charged with various gaming charges in connection with the operation of two Internet cafés. The defendants unsuccessfully argued that players were only paying for Internet time and that any gambling that occurred involved "legitimate sweepstakes offers." *New England Internet Café, LLC v. Clerk of Superior Court for Criminal Business in Suffolk Cnty.*, 462 Mass. 76, 79 (2012). In response, the Attorney General took the "unequivocal position that it constitute[d] illegal gambling." *Id.*

37. An individual in Mississippi was convicted of racketeering and gambling charges in connection with an Internet café where—like here—customers could play simulated games that resembled gambling programs, such as slot machines, keno, and poker. Customers needed a "sweepstakes" code to play the game, but customers could not purchase a sweepstakes code outright. Instead, customers received sweepstakes codes by purchasing something else in the store, such as food or phone minutes.

38. In 2015, the California Supreme Court addressed Internet café gambling in *People ex rel. Green v. Grewal*, 61 Cal. 4th 544 (2015), where the defendant sold Internet time on computer terminals. The defendant promoted the sale of Internet time and other products with a "sweepstakes" giveaway, wherein the defendant provided 100 "sweepstakes points" for each dollar spent, which could then be used to play games of chance. The defendants denied that the operation involved gambling because they were supposedly only selling computer time, and that the sweepstakes games were "not gambling" but instead a "promotional game." The Kern County District Attorney obtained a civil injunction for violations of California's gambling laws, and that injunction was affirmed on appeal.

39. In *Lucky Bob's Internet Café, LLC v. California Dept. of Justice*, 2013 WL 1849270 (S.D. Cal. 2013), the Bureau of Gambling Control, a bureau within the Department of

Justice's Division of Law Enforcement, seized property owned by an Internet café where customers were given 100 entries to a sweepstakes for every $1 of purchased Internet time, which could then be used to play one of seventeen casino-style games. The Internet café owner sued for declaratory relief, seeking a declaration that the operation did not violate California's gambling laws because, among other reasons, it was missing the element of consideration. The district court rejected that argument, granting summary judgment in favor of the California Department of Justice.

40. In *Telesweeps of Butler Valley, Inc. v. Kelly*, 2012 WL 4839010 (M.D. Pa. Oct. 10, 2012), a Pennsylvania federal court held that the purchase of a long-distance telephone card that came with a commensurate number of free entries to participate in a 'casino-style' sweepstakes game constituted "indirect consideration" to participate in the sweepstakes, even though no purchase was necessary and (like here) alternative methods of free entry were available. In rejecting the defendant's argument that the customer was simply paying for telephone time and not the sweepstakes entries, the court declared that "plaintiff's attempt to separate the consideration from the chance to win by inserting a step between the two elements is clever, but it merely elevates form over substance. At bottom, what Telesweeps is doing constitutes gambling." *Id.* at *9.

41. The Ohio Court of Appeals said it best when rejecting a similar sweepstakes scheme in *City of Cleveland v. Thorne*, 987 N.E.2d 731, 744 (2013): "**the justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme apparent here simply because of a contrived separation between consideration and the scheme of chance**." (Emphasis added). The court added, "there is no justification for ignoring the nature of the transaction simply because the system is designed in such a way as to artificially isolate one part

of the illegal transaction from another. The justice system is not so blinded by chicanery." *Id.*

**2. The Rise Of ChumbaCasino.Com And The Wave Of Imitators Like Crown Coins**

42. Crown Coins not only owes its existence to Internet cafés of the early 2000's, but also to the inventor of "social casino" websites like www.crowncoinscasino.com: an Australian company called VGW and its CEO Lawrence Escalante. VGW runs other "social casino" websites that are similar to Crown Coins in all material respects, called ChumbaCasino.com, LuckylandSlots.com, and GlobalPoker.com.

43. Mr. Escalante and VGW have been credited with bringing the Internet café model online with the launch of their gambling websites. Reportedly, in meetings, Mr. Escalante and company executives had discussed Internet cafés in Florida that had—as of that time—managed to avoid restrictions on gambling by offering so-called sweepstakes games with chances to win prizes if customers purchased access to onsite computers.[4]

44. VGW later publicly admitted that ChumbaCasino.com and its other websites are modelled on illegal Internet cafés.

45. Specifically, in 2016, VGW had looked to equity markets for financing, and attempted a backdoor listing through a company called Synergy Plus.

46. In connection with that effort, VGW issued a January 4, 2016 prospectus explaining how the social casino concept is modelled on the illegal Internet cafés that were popular in the early 2000's:

[4] Riordan and Samios, *Laurence Escalante Is Living Large Off Controversial Gambling Billions*, Australian Financial Review, Mar. 19, 2024, available at https://www.afr.com/companies/games-and-wagering/laurence-escalante-is-living-large-off-controversial-gambling-billions-20240304-p5f9kc.

67 Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.

68 Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

**Exhibit 2**, at p. 95.[5]

47. The prospectus also explains how, at the time, "**Internet Sweepstakes Cafes** are reported to have turned over **$10bn (€9.4bn)** in 2015, with **over 5,000** now operating in **12 states**" (*id.* at 69 (emphasis added)), and described the "significant opportunity" of adopting the "sweepstakes café model." *Id.* at 95-96.

48. The prospectus was prepared by H2 Gambling Capital, which is described as "the leading authority regarding market intelligence on the global gambling industry." *Id.* at 68. The prospectus refers to "gambling" 79 times, and noted that "**despite significant prohibition**, [the U.S.] remains by far the largest gaming market in the world." *Id.* at 69 (emphasis added).

49. Likewise, in an October 2015 press release in Australia, the operators of ChumbaCasino.com stated that its gambling websites are "targeting the global casino market, particularly the unrealised [sic] United States **real-money gaming market**."

- VGW is an Australian technology and online gaming company that develops and operates international cash-prize contests through its innovative social casino products. It currently operates on the largest social network and leverages the world's leading payment provider platforms.
- VGW operates a sweepstakes social casino, targeting the global casino market, particularly the unrealised United States real-money gaming market.

**Exhibit 3.**

50. Ultimately, the Australian Securities and Investments Commission put a stop on the prospectus and killed the transaction, reportedly over concerns that the business violated

[5] The Complaint includes only excerpts of the prospectus due to its voluminous size.

gambling laws.

51. Despite that setback in 2016, VGW's ChumbaCasino.com and other gambling websites have been enormously profitable. The COVID-19 pandemic turbocharged the industry, and Lawrence Escalante reportedly became the youngest billionaire in Australia's history. VGW's gambling revenues were reportedly $2.8 billion in 2024.

52. Unsurprisingly, the success of ChumbaCasino.com and other VGW gambling websites spawned a massive wave of copycat websites. Today, the industry reportedly has a compound annual growth of 31% with industry-wide revenues expected to reach $6.9 billion in 2025.

53. Crown Coins is one of the many copycat competitors of ChumbaCasino.com, LuckylandSlots.com, and GlobalPoker.com. As shown in the next section, it operates materially the same way as these websites and the earlier Internet cafés.

**3. Crown Coins' Website Is An Online Version Of An Internet Café**

54. Like the Internet cafés in operation a decade ago, Defendant attempts to separate the element of consideration from chance by offering a two-tiered system of virtual coins, both of which function like casino chips, while fronting the whole affair as a "sweepstakes."

55. The first type of virtual currency, called "Crown Coins," can be used to play the casino games in "Crown Coins Mode" mode with no potential to win money. When using "Crown Coins," a player can only win or lose "Crown Coins." However, for the most part, people only go to www.crowncoinscasino.com to engage in real-money gambling, so those "Crown Coins" are largely ignored.

56. The second type of virtual currency—called "Sweep Coins"—can be used to play the same casino-style games in a "Sweep Coins Mode," where they carry real monetary value and can be redeemed for cash. To get "Sweep Coins," players typically must purchase them in a

package with "Crown Coins." Defendant pretends that the "Sweep Coins" are a "free" bonus added to the sale of "Crown Coins," but as shown above, that is the same tactic Internet café owners unsuccessfully argued before.

57. There are two other problems with the notion that "Sweep Coins" are just a "free" add-on bonus to the "Crown Coins."

58. First, as noted above, most people ignore the "Crown Coins" after buying them. Second, and more importantly, "Sweep Coins" are a proxy for real money. Depending on the package bought, there is a 1:1 or nearly 1:1 correlation between the number of dollars spent and the value of "Sweep Coins" provided in each purchase.

59. For example, if a user spends $9.99, he or she receives 200 thousand "Crown Coins," but also receives 10 supposedly "free" "Sweep Coins." "Sweep Coins" have a redemption rate of one U.S. dollar, so 10 Sweeps Coins is equivalent to approximately $10.00—**the same amount that was charged for the "Crown Coins**." *See* Figure 5, *supra* p. 9. This is how Internet Cafés worked.

60. Likewise, "Sweep Coins" can be redeemed for "real prizes." *See* Figure 4, *supra* p. 8.

61. In short, Defendant is copying the Internet café playbook, but instead of selling Internet time, long-distance phone minutes, or small groceries coupled with supposedly "free" sweepstakes tokens, Crown Coins sells "Crown Coins," which are then ignored so that players can use the "Sweep Coins" for gambling.

62. In sum, the parallels between www.crowncoinscasino.com and the Internet sweepstakes café scheme are clear:

- Both sell a "product" that comes with a commensurate number of "free"

sweepstakes entries to play real money 'casino-style' games of chance in a 'casino-like' setting. Instead of the cafés selling a "prepaid phone card," Defendant sells a virtual gold coin and gives a commensurate amount of "free" "Sweep Coins."

- Both run sweepstakes games perpetually and not on a limited and occasional basis, as is typical with legitimate promotional sweepstakes like the McDonald's Monopoly sweepstakes.
- Both offer casino-like payouts, typically 90% or more of revenues, whereas legitimate promotional sweepstakes normally have very low prize to entrant ratios.
- Both offer several ways to get free entries without requiring a product purchase, such as by playing free, unlockable "Mini-Games," although the number of free entries awarded through this method is a very low amount, if any at all.
- In addition, the "casino-like atmosphere" of www.crowncoinscasino.com further supports the conclusion that the true purpose of the website is "to legitimize illegal gambling." *U.S. v. Davis*, 690 F.3d 330, 339 (5th Cir. 2012).

**D. Defendant Has Evaded The Laws Of Kentucky And Other States**

63. Defendant advertises and presents Crown Coins to consumers in Kentucky as a legitimate online business. But this is false. In fact, Crown Coins is an illegal enterprise. Crown Coins' online presence and advertising provided an aura of legitimacy and legality to Plaintiff and Class members.

64. Promoting gambling in the first degree is a Class D felony in Kentucky pursuant to Ky. Rev. Stat. § 528.020. Ky. Rev. Stat. § 528.020 provides that a "person is guilty of

promoting gambling in the first degree when he knowingly advances or profits from unlawful gambling by [among other things] ... setting up and operating a gambling device."

65. Additionally, Defendant's attempt to further evade Kentucky laws through their Terms of Service fails. Ky. Rev. Stat. § 372.010 provides as follows:

> Every contract, conveyance, transfer or assurance **for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game**, sport, pastime or wager, or for the consideration of money, property or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then actually engaged in betting, gaming, or wagering, **is void**.

(Emphasis added).

66. Defendant's Terms & Conditions are a contract for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game, and therefore are void.

## CLASS ALLEGATIONS

67. Plaintiff seeks to represent a class defined as all individuals who, in the Commonwealth of Kentucky, gambled and lost $5.00 or more within a 24-hour period on www.crowncoinscasino.com during the applicable limitations period (the "Class").

68. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

69. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

70. **Numerosity**. On information and belief, tens of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

71. **Commonality and Predominance**. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a) Whether Plaintiff's and Class members' play on Defendant's online casino games constitutes gambling under Kentucky law;

(b) Whether Plaintiff and the Class lost money gambling to Defendant as defined by KRS § 372.010 *et. seq.*; and

(c) Whether Plaintiff and the Class are entitled to recover their monies spent on Defendant's casino games pursuant to KRS § 372.020 and/or KRS § 372.040.

72. **Typicality**. Plaintiff's claims are typical of the claims of the other members of the Class in that, among other things, all Class members were similarly situated and were comparably injured through Defendant's wrongful conduct as set forth herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

73. **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

74. **Superiority**. A class action is superior to all other available means for the fair

and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class to obtain effective redress for the wrongs committed against the members on an individual basis. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CAUSES OF ACTION

### COUNT I
**Violation of KRS § 372.010, *et. seq.***
**(On Behalf Of The Class)**

75. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

76. The Commonwealth of Kentucky's "Recovery of money lost at gambling" statute, KRS § 372.020, provides a losing gambler with a first-party cause of action to recover any losses suffered. It reads:

> If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery. Recovery may be had against the winner, although the payment, transfer or delivery was made to the endorsee, assignee, or transferee of the winner. If the conveyance or transfer was of real estate, or the right thereto, in violation of KRS 372.010, the heirs of the loser may recover it back by action brought within two (2) years after his death, unless it has passed to a purchaser in good faith for valuable consideration without notice.

KRS § 372.020.

77. Online poker, slots, and similar casino-style gambling are illegal in Kentucky. See *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W. 3d 792, 806 (2020) (holding § 372.020 applied to operator of online poker website).

78. Defendant's online casino games constitute gambling because the players provide consideration (e.g., purchase coins and wager the coins) and by an element of chance (e.g., by spinning a virtual slot machine) create a right to some things of value (e.g., additional coins that would otherwise be purchased for cash and that award additional replays).

79. As such, Plaintiff and the Class gambled when they purchased coins to wager at www.crowncoinscasino.com and played Defendant's games. Plaintiff staked money, in the form of coins purchased with money, at the games of chance on Defendant's website for the chance of winning additional things of value (e.g., coins that grant additional free plays or are redeemable for money).

80. The "coins" Plaintiff and the Class had the chance of winning in Defendant's virtual "casino style" games are "things of value" under Kentucky law because they are credits that involve the extension of entrainment and a privilege of playing a game without charge.

81. As a direct and proximate result of Defendant's operation of its games, Plaintiff and each member of the Class have lost money wagering on Defendant's games of chance. Plaintiff, on behalf of himself and the Class, seeks an order (1) requiring Defendant to cease operation of its gambling devices; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

82. Plaintiff additionally seeks treble damages pursuant to KRS § 372.040.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying this action as a class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(b) For compensatory damages on all applicable claims and in an amount to be proven at trial;

(c) For restitution on all applicable claims and in an amount to be proven at trial;

(d) For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

(e) For treble damages pursuant to KRS § 372.040;

(f) For an order enjoining the wrongful conduct alleged herein;

(g) For other appropriate injunctive and other equitable relief;

(h) For costs;

(i) For pre-judgment and post-judgment interest as provided by law;

(j) For attorneys' fees under the account contracts, the common fund doctrine, and all other applicable rules and law; and

(k) For such other relief as the court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: November 6, 2025

Respectfully submitted,

*/s/ Philip G. Fairbanks*
PHILIP G. FAIRBANKS
BARTLEY K. HAGERMAN
**Mehr Fairbanks Trial Lawyers, PLLC**
201 West Short Street, Suite 800
Lexington, Kentucky 40507
Telephone: (859) 225-3731
Facsimile: (859) 225-3830
pgf@austinmehr.com
bkh@austinmehr.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta*
Matthew A. Girardi*
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie*
Julian C. Diamond*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

*Attorneys for Plaintiff and the Putative Class*

* *Pro hac vice* application forthcoming